WILLIAM T. HAMILTON and VICTORIA HAMIL-
TON, Appellants, v. IDA P. McKINNEY et al, Appellees.
—357 S. W. (2d) 348.

Western Section at Jackson.   December 20, 1961.

Petition for Certiorari Denied by Supreme Court, May 4, 1962.

Cannon, Alexander & Luck, William H. Luck, Memphis, for appellants.

George W. Grider, Memphis, for appellees.

AVERY, P. J. (W. D.). This is an original suit by complainants William P. Hamilton and Victoria Hamilton against Ida P. McKinney, Ben C. Adams, Trustee, and James D. Collier, Jr., Trustee, in the Chancery Court of Shelby County, Tennessee. The complainants below are the appellants in this Court and the defendants below are appellees. In this opinion the respective par-

ties will be referred to in accord with the status in the lower Court or by their personal and respective names.

Suit was filed by complainants who are the only legatees and devisees under the Will of Alma S. Hamilton, deceased.

Ben C. Adams, Trustee and James D. Collier, Jr., Trustee, are residents of Shelby County, Tennessee. Ida P. McKinney, one of the defendants, is a resident of the State of Virginia.

The property involved is located in Shelby County, Tennessee. The bill alleges that defendants Ida P. McKinney and said Trustees are seeking the sale of the property (real estate) described in the bill for the purpose of satisfying certain promissory notes dated February 23, 1956, payable to the defendant, Ida P. McKinney, and executed by the deceased, Alma S. Hamilton, and secured by deed of trust recorded in Book 3654, page 66 of the Register's office of Shelby County, Tennessee, and the bill seeks to have said deed of trust declared void and the notes alleged to be secured thereby cancelled and surrendered to the estate, on the theory that they are gifts or constituted evidence of intended gifts by the deceased to her said daughter, Ida P. McKinney, and that said deed of trust should be satisfied and the lien created thereby cancelled because it covered the property which was devised to complainants by the deceased, and therefore constituted a cloud upon their title.

The bill alleges that Alma S. Hamilton prior to her death, renounced the alleged gifts evidenced by the notes and that the renunciation was in writing and filed and recorded in the Register's office of Shelby County, Ten-

nessee. A copy of that purported renunciation document is filed as Exhibit B to the bill.

The answer and cross-bill were seasonably filed in which the defendant, cross-complainants, denied that the notes represented an intended gift and alleges a valid consideration for the execution of said notes and the deed of trust securing same.

The answer denies all material allegations of the original bill. The prayer of cross-bill is that the property described in the deed of trust be sold to satisfy cross-complainants' claim of $13,500.00 and 10% attorney fees, and for general relief. By amendment avers that complainants are estopped to deny the validity of the trust deed, notes and contract.

This cross-bill was seasonably answered by the original complainants as cross-defendants in which answer the material parts of the cross-bill are denied.

On the hearing of this cause the learned Chancellor, at the conclusion of the proof of the original complainants, dissolved the injunction, dismissed the original bill and declared valid the notes and the deed of trust. He fixed fees for original defendants' attorney at 10% of amount due and ordered sale by the Master in satisfaction of the decree.

Complainants saved exceptions to the decree, prayed, were granted and have perfected an appeal to this Court.

The assignments of error, and brief were seasonably filed. The Chancellor has said in his opinion that there were other grounds upon which the original bill would have to be dismissed and cross-bill sustained than those set out in his opinion. In the reply brief the defendants

have pointed out that the learned Chancellor did not include these "other grounds" in his opinion and have designated certain ones and assigned error thereon.

William T. Hamilton is the adopted son of decedent, Alma S. Hamilton. Victoria Hamilton is his wife. The defendant, Ida P. McKinney, is the daughter of the decedent.

In the assignments of error and brief relied upon by the complainants, it is said:

"1—The Chancellor erred in finding that the consideration for the notes secured by the trust deed and the contract were given in exchange for Ida P. McKinney's full expected inheritance.

"2—The Chancellor erred in finding that the equities alleged in the bill were fully met and denied by the answer.

"3—The Chancellor erred in finding that the proof did not sustain the equities alleged in the bill.

"4—The Chancellor erred in finding that Ida P. McKinney should be granted the relief sought in her bill."

It is said in the assignments of error that the above constitute and are errors of fact.

Now there is another heading in the assignments of error and brief of the complainants below entitled "Errors of Law Relied On:"

"1—The Chancellor erred in ruling that a child has any enforceable right in the estate of its parent.

"2—The Chancellor erred in ruling that the agreement to release an expected inheritance by the heir created an enforceable right in the heir.

"3—The Chancellor erred in ruling that William T. Hamilton and Victoria Hamilton were precluded from denying the validity and effect of the contract.

"4—The Court erred in granting a decree giving the relief sought by the Defendant and Cross-Complainant, Ida P. McKinney, in her cross bill.

"5—The Chancellor erred in refusing to allow Alma Lynum to testify regarding her knowledge of the intention of Mrs. Alma S. Hamilton when she executed the notes and trust deed. The declarations of Alma S. Hamilton revealing her intent in executing the instruments which are the subject of this lawsuit are admissible even though they be self-serving.

"6—The Chancellor erred in refusing to admit the Last Will and Testament to reveal the intent of Alma S. Hamilton regarding the notes and trust deed that are the subject of this law suit.

"7—The Chancellor erred in refusing to admit the affidavit made by Mrs. Hamilton which was recorded and is Exhibit A to the Bill of Exceptions."

As we understand this case there is presented to this Court only three questions, for consideration, by the assignments of error and comments thereon. These questions so posed are as follows:

1—ARE THE STATEMENTS IN THE WILL OF THE DECEASED COMPETENT TO SHOW REA-

SON WHY THE TESTATOR HAS, PRIOR TO THE MAKING OF THE WILL, EXECUTED THE CONTRACT DATED "6-13-55"?

2—IS THE INVOLVED CONTRACT BETWEEN MOTHER AND DAUGHTER BY WHICH THE DAUGHTER AGREES TO ACCEPT $20,000.00 IN FUTURE PAYMENTS, EVIDENCED BY CERTAIN NOTES OF THE MOTHER SECURED BY DEED OF TRUST ON THE INVOLVED REAL ESTATE, VALID AND ENFORCEABLE UNDER THE FACTS HERE INVOLVED?

3—UNDER THE FACTS HERE REVEALED BY THE RECORD, ARE THE COMPLAINANTS ESTOPPED TO DENY THE VALIDITY OF THE CONTRACT HERE INVOLVED?

There has been filed as evidence in this case certain documents that are necessary to a full explanation of the revealed facts supporting the conclusions of the Court below as well as this Court. Some of these documents will have parts thereof copied in this opinion. Others will be referred to only, and they are here designated in proper order for their consideration.

1—Deed executed by Rosina J. Harris to "Alma S. Hamilton, (widow)," dated December 28, 1925, by which the lot here involved is described and conveyed.

2—A document titled "Sale Contract Agreement" dated 6-13-55 signed by Purchaser, Mrs. Alma S. Hamilton, Seller, Ida Pearl McKinney. This contract is so important in this case that it will be copied into the opinion hereinafter.

3—A deed of trust executed in February 1956 by Alma S. Hamilton, a widow, as the first party and Ben C. Adams and James D. Collier, Jr., as second party. This deed of trust describes the property conveyed to Alma S. Hamilton by the deed hereinbefore mentioned. This deed of trust contains recitals hereinafter set out.

4—A document headed "Affidavit" dated 18th day of November, 1959, signed by Mrs. Alma S. Hamilton. It is acknowledged by her before a Notary Public on the same date and it was recorded in the Register's office of Shelby County on November 23, 1959, in Record Book No. 4237 at page 304. This Affidavit is so important in this proceedings the body of it will be copied in this opinion.

5—The Will of Mrs. Alma S. Hamilton dated the 19th day of November 1959, probated in the County Court of Shelby County on December 16, 1959. The pertinent parts of this Will will be shown hereinafter in this opinion.

The sale contract, No. 2 above referred to, is as follows:

"This is to certify that the undersigned known as Alma S. Hamilton agrees to purchase all legally owned and inheritance rights to the property known as 242 South Pauline Street, Memphis, Tenn., for the sum of $20,000. This total sum of $20,000 is to be paid within the next three consecutive years from date of signing this contract. Any and all partial or total payments to be credited and signed for on the bottom of this contract by the seller, known as Ida Pearl McKinney, before a Notary Public.

"Ida Pearl McKinney also certifies that she agrees to sell to purchaser, Alma S. Hamilton, all legally owned and/or inheritance rights to said property, or properties, located at 242 South Pauline Street, Memphis, Tenn., for the sum of $20,000, whose signature shall appear below.

"It is understood and known that both parties are in their sound and wilful mind and that the sum of $20,000 is agreeable to both parties as witnessed by and signed below.

"Extension of further time to be granted present seller, Alma S. Hamilton, as agreeable to both parties. In case of death this contract is to be settled by the living heirs and/or owner as the Deed may show, within the above stipulated time.

"Purchaser: Mrs. Alma S. Hamilton

Seller: Ida Pearl McKinney"

"Date 6-13-55

Witness: C. L. Rhodes

Witness: Ralph W. Holcomb

Notary: Frauline Stevens

My commission Expires

Dec. 29, 1957".

The pertinent part of No. 3, the deed of trust, is as follows:

"But this is a Trust Deed, and is made for the following uses and purposes, and none other; that is to say: The said parties of the first part are justly

indebted to Ida P. McKinney or the holder of the notes hereinafter mentioned in the sum of Seventeen Thousand and No/100 ($17,000.00) Dollars, evidenced by eight non-interest bearing promissory notes in the respective principal amounts and with the respective due dates as follows:

"$2,000.00 on or before June 1, 1956
  $1,500.00 " " " December 1, 1956
  $2,500.00 " " " June 1, 1957
  $1,500.00 " " " December 1, 1957
  $2,500.00 " " " June 1, 1958
  $1,500.00 " " " December 1, 1958
  $2,500.00 " " " June 1, 1959
  $3,000.00 " " " December 1, 1959

"The above listed notes and this Deed of Trust securing same were given by Alma S. Hamilton to Ida P. McKinney, and are hereby accepted by the said Ida P. McKinney in lieu of any and all rights which she may have, now or in the future, in the property and estate of Alma S. Hamilton (except such personal effects as the said Alma S. Hamilton may choose to bequeath to the said Ida P. McKinney,) and in full discharge and settlement of any and all claims of any kind or character, real or asserted, which the said Ida P. McKinney may have against the said Alma S. Hamilton or William T. Hamilton."

This deed of trust authorized the trustees named therein to sell the property described therein in default of the payments of any one of the above referred to notes secured by said deed of trust.

The body of the document No. 4 above referred to as Affidavit is as follows:

"I, the undersigned, Alma S. Hamilton, hereby make oath that on or about February 23, 1956, when I executed certain promissory notes to my daughter, Ida P. McKinney, I intended making a gift to her by making the payments on the dates indicated by the notes. Subsequent to that I have decided not to make any gift other than the ones that I have already paid. Accordingly, I expressly cancel and renounce the gift and the notes that evidence this gift and further state that these were given without consideration so that I further rescind and cancel the trust deed which was recorded in Book 3664, Page 66 of the Register's Office of Shelby County, Tennessee. The property described in said trust deed is more particularly described as follows:

"Part of Block 19 of Dudley Dunn's second subdivision. Beginning at a point in the east line of South Pauline Street 71.4 feet south of the south line of Eastmoreland (Spring) Avenue, as said Avenue is now established and located; thence south with said east line of South Pauline Street 50 feet to a point 300 feet north of the original north line of Linden Avenue; thence east parallel with Eastmoreland Avenue 163 feet to the west line of an alley; thence north with said west line 50 feet to a point; thence west 163 feet to the point of beginning. Being the same property conveyed to Alma S. Hamilton by deed recorded in Book 1045, Page 256, Register's Office of Shelby County, Tennessee.

"I have repaid in full the notes given to Ida P. McKinney that were secured by a trust deed recorded in Book 3761, Page 174, of the aforesaid Register's Office.

"Witness my signature this 18th day of November, 1959.

"Mrs. Alma S. Hamilton."

The pertinent part of the Will necessary, referred to as Document No. 5 above, is as follows:

"II.

"All of my property, both real, personal and mixed, of whatever kind and wherever located, I hereby give, devise, and bequeath to my son, Dr. William T. Hamilton and his wife, Victoria Hamilton, to share and share alike. Should either of them predecease me, then I give the survivor one-half of all of my property and one-half I hereby give to the children of the marriage of my son, Dr. William T. Hamilton and his wife, Victoria Hamilton.

"III.

"I am not unmindful that I have a daughter, Ida P. McKinney. She has already received certain cash. It is my expressed desire that she receive nothing further from my estate and that the promissory notes which I have previously executed and delivered to her be considered null and void and that no further payment be made to her in satisfaction of these notes that were executed in 1956. I further revoke the gift contemplated when I executed the notes. It is my present understanding that I have the power to disinherit a child and that is my intention."

■ Where the father and mother, either or both, contracts with the child who is legally capable and for a valuable consideration, and there is no fraud about the transaction, it has been held so many times that such a contract is just as legal as if it had been made between persons of no kin. If this were not so it would deprive one class of our citizens the right to contract with each other. It would follow then that if parents and children can contract with each other legally, and that a legal contract can be made for the sale, transfer or assignment of an expectancy by the child in the parents' estate between the parent and child, which a Court of Equity will recognize, and prevent the child from revoking it or prevent the parent from revoking it and denying it, the effect would be valid. However, we will answer that question when we come to the proper answer to Question No. 2 as posed by the assignments of error.

For the moment, assuming that the contract here involved could be legal, let us answer Question No. 1.

In the sale contract there is no doubt but that both the mother and Mrs. McKinney understood, as shown by the terms of that written contract, that Mrs. McKinney had an inheritable right in the property described as 242 South Pauline Street. There is no doubt that they both recognized that she had an equitable interest in that property separate and apart from that which might be termed an expectancy. In the first paragraph it states that Alma S. Hamilton agrees to purchase "all legally owned and inheritance rights to the property known as 242 South Pauline Street, Memphis, Tenn." In the second paragraph it is recited that the daughter, Mrs. McKinney, "agrees to sell to purchaser, Alma S. Hamilton,

all legally owned and/or inheritance rights to said property." In the third paragraph it is said that "both parties are in their sound and willful mind and that the sum of $20,000 is agreeable to both parties."

Now looking back again to the first paragraph in that document, it says: "This total sum of $20,000 is to be paid within the next three consecutive years from date of signing this contract." And finally in the last paragraph immediately above the signatures, it is provided that "Extension of further time to be granted present seller, Alma S. Hamilton, as agreeable to both parties." "Seller" evidently means the "Purchaser" to pay the stipulated amount.

Now in a few months after the execution of that contract Mrs. Hamilton paid Mrs. McKinney $3,000. Mrs. McKinney then had drawn a deed of trust and notes which are involved in this lawsuit and dated February 1956 making explicit reference to the consideration for which the secured notes were executed. At that time there was only $17,000 unpaid as provided in the original contract and the payment of that $17,000 fixed by the installment dates shown by said notes and trust deed, so that the last payment was due December 1, 1959. That deed of trust was based upon the same consideration as the former contract, and the notes evidencing the installment payments shows compliance with the "extended time" agreement as set out in that contract. The whole $20,000.00 under the contract, was due and payable by June 13, 1958, while by the provisions of the deed of trust, the time for payment of the last amounts due was extended for six to 18 months, approximately, with final amount payable on December 1, 1959.

In addition to the execution of the deed of trust, which Mrs. Hamilton signed and acknowledged which was recorded soon after it was executed, she signed the notes described in said deed of trust, of which there are eight. These notes are exhibited in this record. So the final contract is evidenced by ten signatures of Mrs. Hamilton. One to the original document, one to the deed of trust and eight to the respective notes, which shows very clearly that Mrs. Hamilton understood the whole situation. Not only is that true, but the other circumstances which will be referred to hereinafter in answer to some of the other questions involved, indicates very clearly that Mrs. Hamilton and Mrs. McKinney both recognized that Mrs. McKinney had an equitable interest in the property in addition to her expectancy.

What would be the result then, if the Affidavit and the Will which Mrs. Hamilton made just shortly before she died in which documents she made contrary statements to those in the original contract and the deed of trust, supported by the execution of the notes could be considered to contradict her contractual statements? There could be no other conclusion, therefore, except that on ten different occasions over her signature she had said one thing and on two later occasions had by self-serving declarations, after changing her mind, undertook to contradict ten expressed prior declarations by her in writing.

Furthermore, these two documents relied upon by complainants as evidence to show the intent of Mrs. Hamilton at the time the original contract, trust deed and notes were executed, do not state that she had a different intent from that expressed in the prior executed documents.

They are documents simply saying she had changed her mind about the situation, even though the complainants admit that she had done willingly that which is stated in the originals, and with their approval.

Complainants rely on the case of Anderson v. Nichols, and the authorities cited therein, to show that the Will and the revocation document are competent, and that the testimony of Alma Lynum should have been admitted for the same purpose. In that case the real question was whether or not a deed had been delivered. Judge Shriver, who wrote the opinion for this Court, quoted from Kelly v. Bank of America, etc., 112 Cal. App. (2d) 388, 246 P. (2d) 92, 96, 34 A. L. R. (2d) 578, at page 585, and which quote is as follows:

"When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving. Thus, in cases involving the delivery of deeds, declarations of the alleged grantor made before and after the making of the deed are admissible upon the issue of delivery, and it is immaterial that such declarations are in the interest of the party producing them." Anderson v. Nichols, 39 Tenn. App. 503, 519, 286 S. W. (2d) 96, 103.

In that same case Judge Shriver quoting from Wigmore on Evidence, Sec. 1777 said:

"Declarations accompanying the delivery of a chattel or a deed may help to show whether it is an

act of gift, advancement, or otherwise; here the Courts seem to interpret liberally the rule of contemporaneousness.''

In that case not only the question of delivery was involved, but the question of fraud, and badge of fraud upon top of badge of fraud had been shown. Certainly the distinction is very clear from that of the present case. There is no fraud alleged in this case now before us. The witness that they claim the Chancellor was in error in refusing to let her testify about something that Mrs. Hamilton said hadn't worked for Mrs. Hamilton since 1943. No statement was made for the benefit of the record or otherwise showing that there was any statement made by Mrs. Hamilton contemporaneous with the delivery of the original contract or the deed of trust, expressing any contrary intention than as shown thereon.

The defendants rely upon the case of McDowell v. Turney, 37 Tenn. 225, which, as viewed in the facts of that case, simply holds that self-serving declarations even when made under oath, are inadmissible. They also rely on Ottinger v. Brown, 43 Tenn. App. 44, 306 S. W. (2d) 5, to the effect that self-serving declarations, even when made in a will, have no probative force.

In Ottinger v. Brown, 43 Tenn. App. 44, 306 S. W. (2d) 5, in an opinion by Judge McAmis, Presiding Judge of this Court, the question of whether or not a deed had been validly delivered, and if it had been so delivered, could it be rescinded by the will subsequently executed:

''No authority is cited for the insistence of defendant that the self serving declarations of Mrs.

Ottinger to her attorney and set forth in the will five years after the event can be given probative force and we believe none can be found. And, manifestly, if there was a valid delivery of the deed it can not be rescinded by will subsequently executed.''

And again the Court said:

''* * * Where the effect of the subsequent declarations, however, is to impeach a recorded deed by showing non-delivery, they are not admissible.''

█ We think sufficient authorities are cited for our determination that the assignment of error based upon the Court's refusal to permit the affidavit and the will to be read in order to impeach the consideration expressed in original contract and deed of trust, and his failure to permit testimony evidently made prior to 1943, cannot be sustained. They were competent, of course, to show that she attempted to revoke them and, had there been no valid transaction, that is no consideration, or had they been procured by fraud, then we would have entirely another question. We, therefore, answer our Question No. 1 in the affirmative, and overrule the assignments of error levelled at such action of the Court.

This brings us now to Question No. 2. Soon after the complainant, Dr. Hamilton, was introduced as a witness, the effect of the Dead Man's Statute, upon the admissibility of transactions and conversations with the deceased Mrs. Hamilton, by the litigants was brought to the attention of the Court and both sets of counsel objected to the introduction by the respective parties of conversations with the deceased Mrs. Hamilton. Thereupon, the Court invited both sets of counsel to his Cham-

bers and the Court was recessed for a few minutes. Upon return to the bench and before resuming trial of the case, the Court said:

"For the benefit of the record, it might not be amiss to state that the Court and counsel have had a conference with reference to the question of admissibility of statements or testimony concerning statements and transactions with Mrs. Hamilton insofar as this lawsuit is concerned.

"As a result of statements by counsel, inquiry by the Court, the Court finds that this is an action by William T. Hamilton and Victoria Hamilton, individually, and not as co-executors of the estate of Alma Hamilton, and that this being an action in effect between heirs and distributees, and not brought by the personal representatives in their official capacity, the Dead Man's Statute, 24-105 T. C. A. is not applicable.

"To that action or ruling by the Court, counsel for both complainants and the defendants, while accepting the accuracy of the statements made by the Court as to the reason for its ruling, object to the action of the Court in so ruling, and except; is that correct, Mr. Luck?

"MR. LUCK: Yes.

"THE COURT: Is that correct, Mr. Grider?

"MR. GRIDER: Yes.

"THE COURT: Go ahead with your examination of Dr. Hamilton."

Let us say that the proof in this case is very clear that both Mrs. Hamilton and Mrs. McKinney regarded the consideration expressed in that contract, as well as the consideration recited in that deed of trust, as not only legal, but valuable. And under the proof of this case it is very clear that Dr. Hamilton knew why those documents were executed. He knew that his adopted mother wanted to give him the real property here involved. He knew and so testified that Mrs. Hamilton had agreed with Mrs. McKinney to pay Mrs. McKinney $20,000, as evidenced by the contract, and the balance remaining when the deed of trust was executed of $17,000, to be in full of any interest that she might have in the involved property, and in fact in the entire estate of her mother.

Mrs. Hamilton, the wife of Dr. Hamilton, testified to the same effect. Both of these parties knowing why these documents were executed, and with the statements made in them which are signed by the parties to be charged in connection with the transaction, sat silently by, as far as this record shows, until about a month before Mrs. Hamilton, the testatrix died, and then these affidavits of revocation and Will were executed.

It is an admitted fact that prior to 1925 this daughter and her mother had gone into the boarding house business over on Madison Avenue. The business at that point was sold and the property purchased over on Pauline Street. Two years after that the daughter continued to contribute money from her salary and assisted her mother in the operation of the business. It is undisputed that the business grew; that from time to time there were additions made to the property and that this

daughter, not only faithful to her mother after she left the place, but that she was faithful to her adopted brother and his wife, the complainants in this cause.

After she left this place and had gone to Kentucky she visited there on different occasions where conferences were had between the parties to this suit along with their mother. Dr. Hamilton, in his testimony made the following statement:

"Q—Would you state the circumstances of this, and state the substance of what was said?

"A—Well it happened at 242 South Pauline, my mother's home and in my apartment. I was called down there by my sister at my mother's request, and there was a discussion that took place concerning distribution of her estate should she pass away. She wanted to give twenty thousand dollars to her daughter, Mrs. McKinney, and the house to me so it would remain as a fraternity house and for the students at the University of Tennessee. That was the essence of it, and it was stated, if it was all right with me, and it was all right with me, to have it set up like that.

"Q—What was your statement or feeling at the time?

"A—I felt that was fair. I thought it was fair."

On cross examination of Dr. Hamilton there appears to be some contradiction between his statements concerning conversations with the defendant, Mrs. McKinney relative to the contribution she made to the business operated by the deceased, Mrs. Hamilton, but these contradictions are not of such character as affects

the rights of the parties in this case. Dr. Hamilton says the night before his discovery deposition was taken that he had been up all night; that his wife kept the dates down on the business transactions and he was not familiar with those dates and so some little discrepancies of an immaterial nature appear in his statements, particularly on cross examination.

This record shows that there was an affectionate relationship between the mother, Mrs. McKinney and Dr. Hamilton and his wife continuing through a long period of years and that in the latter part of August or the first of September 1956, Mrs. McKinney made a loan to Dr. and Mrs. Hamilton of $7,500, evidenced by a cashier's check drawn on the First National Bank of Roanoke, Virginia, payable to Mrs. Ida P. McKinney in said amount and endorsed on the back, "Pay to the order of Mr. and Mrs. William Thomas Hamilton, Ida P. McKinney", also endorsed "Mrs. William Thomas Hamilton, deposit only". Mrs. Victoria Hamilton, defendant, admits borrowing that money, and on cross-examination she was asked relative to statements that she had with Mrs. McKinney about payment of the notes evidenced by the deed of trust executed by deceased to secure her daughter in the amount of this $17,500, and the notes there mentioned:

"Q—Do you recall her making any statement to you about it, about the notes?

"A—Well, the only time that it was mentioned with her was the time that she gave the loan for us to purchase our home on Chanwell. She made the

remark that she didn't want that to interfere with the notes Mrs. Hamilton was supposed to pay her.

\* \* \* \* \* \*

"Q—Were matters reasonably congenial with Mrs. McKinney at that time?

"A—Yes.

"Q—And the notes that are the subject of this lawsuit were in existence at that time?

"A—Yes."

On cross examination this witness was asked and answered:

"Q—Now, you stated that Mrs. McKinney loaned you and your husband the money with which to buy your home on Chanwell?

"A—Yes.

\* \* \* \* \* \*

"Q—Did she give the money to you and your husband?

"A—Yes."

A photostatic copy of the check is Exhibit 5 to her deposition.

"Q—Before Mrs. McKinney came down and gave you that money, you had a telephone conversation with her, didn't you?

"A—Yes.

\* \* \* \* \* \*

"Q—And you called and asked for the money?

"A—Yes.

"Q—Did you not at that time give her assurance that the other notes signed by Mrs. Hamilton would continue to be paid at the same time that you were going to pay off this loan?

"A—Yes.

"Q—Isn't it a fact that Mrs. Hamilton helped you pay off this loan from Mrs. McKinney?

"A—Yes."

In the course of answering these questions with respect to that loan this witness said:

"A—* * * The reason that we had to borrow this money from Mrs. McKinney was because Mom, Mrs. Hamilton, couldn't borrow cash on account of these notes and that is the reason she asked me to call Mrs. McKinney and ask her if she would loan us the money. At that time she had enough people coming in to rent the apartment, and if we moved out, she could rent the apartment.

"Q—And in connection with getting that loan, you told Mrs. McKinney she would get the $20,-000.00 notes?

"A—I didn't say the $20,000.00. I told her it wouldn't interfere with her notes.

"Q—Were her notes to be paid off in any regular fashion?

"A—Mrs. Hamilton said twice a year, I believe in June and December, in certain sums.

"Q—Why don't you want to pay Mrs. McKinney those notes right now?

"A—Before Mrs. Hamilton's death she renounced the notes and then when she made the will, she willed the house to us, and I don't feel like we owe her any."

This witness testified further that she had in her possession the income tax reports made by Mrs. Hamilton, deceased, for a number of years and some of them were introduced and filed as a part of the record. They show the payment of very little income tax, but they did show, according to this witness' statement, capital improvements to the property involved of some $70,000.00 with large charge-offs in depreciation. This witness was further asked what the value of that property was and she said she would not say but that the house was insured against loss by fire etc. for $40,000.00 and the contents for $10,000.

The complainants then introduced a witness by the name of Viola Rose. She testified she worked for Mrs. Hamilton, deceased. This witness was asked if she heard any conversation between the defendant Mrs. McKinney and the deceased, Mrs. Hamilton sometime in about 1956, at the time that Mrs. Hamilton was sick and had just gotten out of the hospital. She said the conversation took place there in the room where Mrs. Hamilton was sick. She was asked:

"Q—What did you hear in that conversation?

"A—Well, when I come to get paid off, Mrs. Hamilton told her to pay us off and she would get some checks cashed and she would pay her back.

"Q—Did you hear some figure like, $20,000.00?

"A—Yes, sir."

There were some leading questions asked and objected to and the Court instructed counsel not to lead the witness, and thereupon the Court said to the witness:

"THE COURT: Get on to what she started to testify about. You say on one occasion when Mrs. Hamilton was sick in bed and Mrs. McKinney was in the room, you happened to go in the room where they were to be paid by Mrs. Hamilton and that Mrs. Hamilton asked Mrs. McKinney to pay you all the money, and Mrs. Hamilton told Mrs. McKinney she would pay her back later on?

"A—Yes, sir.

"THE COURT: Did you ever hear any other conversation between Mrs. Hamilton and Mrs. McKinney about money either owed the other?

"A—Yes, sir.

"THE COURT: Tell us about that.

"A—Mrs. Pearl said she wanted to be paid off so if anything should happen she would have her part.

"THE COURT: Mrs. Pearl is Mrs. McKinney?

"A—Yes, sir.

"THE COURT: Mrs. McKinney said to her mother, 'I want to be paid off so if anything happens I'll have my part'?

"A—Yes, sir. Mrs. Hamilton promised she would pay it, and after that she got mad and she told her she

wasn't going to pay any more because she didn't owe her nothing and she wasn't going to pay her any more''.

The last conversation this witness referred to Mrs. Hamilton getting ''mad'', was by telephone, and that Mrs. Hamilton told her that was what she told Mrs. McKinney. An objection made to that part of her statement was sustained.

On cross examination by Mr. Grider this witness admitted that Mr. Grider came out to see her sometime before this trial and that she there told him that she didn't know anything about it and had never heard any conversation between Mrs. Hamilton and Mrs. McKinney about this involved debt. When she was asked why she had made an untrue statement, she said that she didn't know Mr. Grider. When the examination of this witness closed, Mr. Luck said to the Court:

''MR. LUCK: At this point, I feel we have carried the burden of proof and if there is any question about that, I want to introduce a part of Mrs. McKinney's pre-trial deposition to establish certain facts.

''THE COURT: Mr. Luck, do you rest, or do you have any further proof?

''MR. LUCK: The only thing I feel like I can do is offer her testimony in this pre-trial deposition.''

There was some discussion and argument back and forth between Mr. Grider and Mr. Luck and the Court and after this discussion the Court said:

"THE COURT: Why encumber the record by letting him read what he wants, which is going to be what you don't want; isn't that right? Your objection is overrule and you may note your exception. Is that all you have, Mr. Luck? Why not let it come in, and we will consider the deposition, that is, the portions he chooses to enter will be part of his proof in chief. The remainder will be entered by you so that the entire deposition is now in the record."

So far as this record indicates neither party moved to strike any part of the pre-trial deposition given by Mrs. Ida P. McKinney and it is put into this record and at the close of that deposition this record shows that, "The foregoing evidence was all of the evidence presented at the trial of the cause." There is nothing in the record to indicate which part of it was introduced by complainants or which part was introduced by defendants. And perhaps from this record it is proper to say that without objection on the part of either counsel, it appears they both agreed that the deposition be read into the record as a part of the evidence.

Since counsel for complainants in their brief supporting the assignments of error have referred to the testimony of Mrs. McKinney, whether it is necessary or not, to a proper decision of this case, certainly it is proper to show its essence in this opinion. This deposition was taken by counsel for complainants and there was no examination of the witness by counsel for defendants. It fully supports the contention that this daughter and her mother went into this boarding house business together, and that the daughter put cash into it at the time, perhaps in the very first instance only $250.00;

that the first business failed and there was some lawsuit between the owner of the real estate and Mrs. Hamilton, the deceased, and that the boarding house equipment was moved over on South Pauline Street.

It is further revealed that this daughter continued to help her mother in many ways, from the very beginning, using the funds resulting from her personal labors, and even after the daughter had married and gone to New York, her help in the business which had been inaugurated by both of them, continued to a considerable extent, and in fact that all of the profits from the business went right back into the business during those years, particularly prior to the time that Mrs. McKinney made this loan of $7500.00 to Dr. Hamilton and his wife to buy a home of their own, and it certainly is inferable from what they all say that some of the income from the boarding house business was used by Mrs. Hamilton to help repay Dr. Hamilton's debt to Mrs. McKinney. Her deposition further reveals the fact that she and her mother discussed the situation at different times and that the mother wanted to provide $25,000 for her to have that out of her property, but that the daughter was satisfied to have her mother contract for only $20,000.

It is further revealed by her testimony that counsel who drew this deed of trust and notes was familiar with the matter now in litigation and was subpoenaed as a witness, and that the Chancellor terminated the hearing without putting Attorney Adams on to testify, which testimony might have been confidential to him and might not have been permissible over his objection, but at least Mrs. McKinney states that he was Mrs. Hamilton's attorney in the drafting of this trust deed and notes, and cer-

tainly the recitation carried into the trust deed bears out that statement. In the main her testimony confirms the essential averments in her answer and cross-bill. Counsel for defendants also made offer of further proof, but the Chancellor refused to permit it.

Under the facts of this case as proven, even without the deposition which was taken as a discovery deposition of the defendant Mrs. McKinney, it is very clear that six of the eight notes are due and unpaid, but the remaining notes numbered three to eight, inclusive, amounted to $13,500.00 It is also clear, without giving consideration to the deposition of Mrs. McKinney, that the proof fully supports the decree rendered by the Trial Court. So that the answer to Question No. 2 becomes strictly a legal question, when applied to the undisputed facts.

The weight of authority in Tennessee is that an heir may by contract with his ancestor relinquish his expectancy in the latter's estate, and that the contract, if fairly made, as for a valuable consideration, will be enforced, the releasor will be precluded afterwards from setting up a claim to any part of his ancestor's estate. Anderson v. Forbes, 169 Tenn. 223, 228, 84 S. W. (2d) 104; Gore v. Howard, 94 Tenn. 577, 30 S. W. 730.

The opinion in Anderson v. Forbes, supra, is supported by the many cases from other jurisdictions as well as our own referred to in that opinion. Power's Appeal, 63 Pa. 443; Gore v. Howard, supra; Nesmith v. Dinsmore, 17 N. H. 515; Coffman v. Coffman, 41 W. Va. 8, 23 S. E. 523, 524.

Quoting in Anderson v. Forbes, supra, from Coffman v. Coffman, supra, our Court said:

"So the parent has the lawful right to advance to the child the full portion that the child would be entitled to as an heir at the time of his death. The parent having the right to make the advancement, and the child having the right to receive it, they have the right to agree on a certain fixed amount, the present acceptance and use of which shall be deemed equivalent to a full distributive share of the estate at the death of the parent, whenever that may occur. And when a child accepts and uses such an advancement he is estopped from denying the express conditions thereof contained in the instrument by virtue of which he receives it."

Our Court also quotes with approval the statement from Eisseer v. Hoppel, 158 Ind. 82, 62 N. E. 692, 694, wherein it is said:

"Public policy rather promotes, than condemns, such contracts. It often happens that children, after leaving home, and engaging in enterprises of their own, become so situated that the advancement, at a particular time, of a less amount than seems likely to be a full share at the death of an ancestor, will be more profitable to the recipient than to wait for the larger amount. In such cases, therefore, parents and other kindred, being presumed to be considerate of the rights and interests of those who are naturally the objects of their bounty, are left free to deal with their heirs as they may deem just with respect to the heir's ultimate portion, and may advance a part, *or, as in any other matter, contract with the heir for a specific amount in full of all expectancy.* * * *"
(Emphasis added.)

Also quoted in said opinion and approved is statement from Longshore v. Longshore, 200 Ill. 470, 65 N. E. 1081:

"A son had accepted a warranty deed from his father to certain land, and the deed contained an agreement that it was made by the grantor and accepted by the grantee as his full share of the estate of the grantor. This was held to constitute a release of the expectancy of the son as an heir of his father. A like holding was made in Bolin v. Bolin, 245 Ill. 613, 92 N. E. 530, and in Donough v. Garland, 269 Ill. 565, 109 N. E. 1015, Ann. Cas. 1916E, 1238. To like effect are Smith v. Smith, 59 Me. 214; Quarles v. Quarles, 4 Mass. 680; Kenney v. Tucker, 8 Mass. 143; Summersville's Estate, 129 Pa. 631, 18 A. 554; Squires v. Squires, 65 W. Va. 611, 64 S. E. 911; Kinyon v. Kinyon, 72 Hun. 452, 25 N. Y. S. 225, cited with approval in Gore v. Howard, 94 Tenn. 577, 30 S. W. 730."

Our Supreme Court commenting in Anderson v. Forbes, supra, 169 Tenn. at page 230, 84 S. W. (2d) at page 106, said:

"Appellants, under the statutes of descent and distribution, were only entitled to receive out of their grandfather's estate, 'the same portion of the estate * * * as their parent would have been entitled to if living.' If John Forbes had been living, he would not have been entitled to receive any portion of that estate. Having been paid an amount which he agreed was in full settlement and adjustment of any right, title, or claim he might have in the property of his father, he would have had no portion of

the estate coming to him, had he survived his father.''

It is true in that case much is said about the doctrine of advancements and the rights of a child when the ancestor has made advancements, but when the case is read carefully, it seems to have put the decision upon the fact that there had been a valid contract made between the parent and the child and therefore neither the child,—had he been living, and since he died his children, could stand on no higher ground than he did, who was bound by that contract.

■ Applying that same doctrine to this case in reverse, it seems to be complete authority for the fact that here Mrs. McKinney having accepted even a less amount paid, and to be paid, than her mother had said she wanted her to have for her interest and expectancy, which in the first instance was $25,000 as hereinbefore stated, and with Mrs. McKinney saying that she thought $20,000 would be nearer right, and with these two persons, an adopted son and his wife who are complainants and who are apparent beneficiaries of the entire estate of the adoptive mother under her Will, having agreed to the consideration as stated in the contract until just before the death of this 84 year old lady, the revoking affidavit came into being, if for no other reason their claim advanced here should be estopped, in equity, for it is apparent that they have not done, nor offered to do equity, as relates to this daughter. If they had they would have said, ''yes, we will sell this property and we will divide it equally between the adopted son and the real child, who is Mrs. McKinney'', that is, if they wanted to have the contract declared void.

We agree that the rule is not the same in all of the States of our Union, but it seems that Tennessee has followed the majority rule, and that certainly the child can contract with his parent, where there is no fraud, and they are both capable of executing a contract, and particularly where those who would be otherwise the beneficiary, had no contract been made, have all been agreeable to and have acquiesced in that which the deceased Mrs. Hamilton had done by her contract with her daughter, Mrs. McKinney. We think the majority rule, such as prevails in Tennessee is the more just.

Complainants rely principally upon the case of Jones v. Jones, 163 Tenn. 237, 43 S. W. (2d) 205. We have read that case carefully more than one time and in our opinion it has no application by which the issues in the instant case could possibly be controlled. That case went off on demurrer filed in connection with the probate of a will. A codicil was offered in probate in the Probate Court. The demurrer was there filed. Immediately the case was certified and filed with the Circuit Court, and in the Circuit Court upon the hearing the demurrer was sustained. The Supreme Court said:

"* * * These grounds of demurrer go to the construction of the will and the document offered as a codicil, and are not matters for the probate court. The demurrer in these particulars accordingly should have been overruled."

The document in question, not the original will, but that which was claimed to be a codicil to the will, and should have been probated along with the entire will, was the real issue involved. The alleged codicil was in

the handwriting of the testator. The Court further said in that case:

"While instances are not very common, nevertheless it is well settled that a paper writing may operate in part as a will and in part as another instrument, if it deals distinctively with reference to different properties, plainly indicating a testamentary effect as to one property and a present operation as to the other property." Citing several authorities.

In concluding the opinion, Chief Justice Green simply said:

"Reverse and remand to the circuit court of Cocke county, with directions to that court to remand to the county court of the same county for further proceedings in conformity with this opinion, to the end that the document aforesaid may be probated as a testamentary direction concerning testator's personal estate."

The case does not control the issues involved here as we understand it. We are, therefore, constrained to answer our second question in the affirmative, and that the contract involved in this case, consisting of two separate and distinct instruments, all of which was agreeable to the persons who now attack them, is a valid and binding contract between the deceased and her daughter, and binds the beneficiaries under the will, just as held by the Chancellor, and in the absence of some other error that might effect the decree of the Chancellor, it must be affirmed.

■■■ Now we think what we have said in connection with our answer to our second question specifically brings us to the correct answer to our third question. Certainly

the complainants in this case can stand on no higher ground than did the deceased, Mrs. Hamilton. She could not have and did not legally revoke the contract made with her daughter. So neither can the beneficiaries of her will revoke it, but having consented and agreed to the contract, as understood not only by the mother and the daughter, but by these complainants who now attack them, they certainly are not permitted to come into this Court with hands that are stained with injustice and invoke the doctrine that would destroy this contract. Consequently they are estopped from setting it aside.

All of the assignments of error are overruled and the decree of the Chancellor affirmed at the cost of the complainants and their sureties on their appeal bond, who are the appellants in this cause. Decree in accord with this opinion.

Carney and Bejach, JJ., concur.